# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MICHAEL GOMEZ, JOSEPH LOWE,
IAN JOI, and ALEJANDRO BAEZ
and JOSEPHINE CARTAGENA as
Co-Representatives of the Estate of
JAYDEN BAEZ,

           Case No: 6:23-cv-1824-GAP-RMN

        Plaintiffs,

v.

SCOTT KOFFINAS, RAMY
YACOUB, and CHRIS A.
BLACKMON, in his official capacity
as Sheriff of Osceola County,

        Defendants.

_____/

## ORDER

*"It is not better that all felony suspects die than that they escape."*[1]

---

[1] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

*Preface*

This is a § 1983 case that involves the all too familiar use of deadly force by law enforcement. Here, 28 deputy sheriffs were dispatched in order to apprehend two young petit thieves—two of those deputies fired 31 rounds into an occupied vehicle, killing one occupant and wounding two others. Seeking qualified immunity (as usual), the deputies claim they discharged their weapons because the advancing automobile driven by the deceased put them in fear for their lives. Construing the conflicting evidence in Plaintiffs' favor, Defendants' claim for qualified immunity is not well-founded and their Motion for Summary Judgment must be denied.

## I.    Background

On September 20, 2023, Plaintiffs Michael Gomez ("Gomez"), Joseph Lowe ("Lowe"), Ian Joi ("Joi"), and Alejandro Baez and Josephine Cartagena, as Co-Representatives of the Estate of Jayden Baez ("Baez"), (collectively, "Plaintiffs")[2] filed a Complaint against Defendants Scott Koffinas[3] ("Koffinas"), Ramy Yacoub[4]

---

[2] Gomez was 18 years old at the time of the incident; Lowe was 19; Joi was 17; and Baez was 20. Doc. 106, FDLE E-Book at 154, 164, 167, 195.

[3] Sgt. Scott Koffinas has been employed with the Osceola County Sheriff's Department for more than 16 years. *See* Doc. 106, FDLE E-Book at 60.

[4] Sgt. Ramy Yacoub has been employed with the Osceola County Sheriff's Department for more than 12 years. *See* Doc. 106, FDLE E-Book at 66.

("Yacoub") (the "Deputies"), and Chris A. Blackmon [5] ("Blackmon" or the "Sheriff") ("Defendants") for claims associated with the Osceola County Sheriff's Department's ("OCSD's") deadly response to a shoplifting incident which unfolded in the parking lot of a Target in Kissimmee, Florida on the evening of April 27, 2022. Doc. 1, ¶¶ 14-17. The Complaint asserted 42 U.S.C. §§ 1983 and 1988 claims for unreasonable seizure and excessive force violations of the Fourth Amendment by the deputies, along with a *Monell* [6] claim against OCSD and a claim under Fla. Stat. § 768.28(9)(a). *See* Doc. 1.

On April 11, 2024, with leave of the Court, Plaintiffs filed an Amended Complaint to incorporate the grand jury presentment findings (regarding Defendants' criminal liability) that were not publicly released until February 29, 2024. Doc. 32; *see also* Doc. 31. Plaintiffs also dropped the claim under Fla. Stat. § 768.28(9)(a) and clarified that each Plaintiff has a claim against each deputy for unreasonable and excessive force in violation of the Fourth Amendment (Counts I-VIII). Doc. 32 at 16-23. The Amended Complaint continues to assert a *Monell* claim in Count IX. *Id.* at 24-25.

_____

[5] The Complaint (and Amended Complaint) initially listed former Sheriff Marcos Lopez as a defendant in his official capacity as Sheriff of Osceola County, but he was substituted for Osceola County's present Sheriff, Christopher A. Blackmon, on June 17, 2025, after the Court granted Defendants' unopposed motion. Doc. 1; Doc. 32; Doc. 109; Doc. 112.

[6] *See Monell v. Dept's of Social Services of the City of New York*, 436 U.S. 658 (1978).

This story begins with a thorough recounting of the events that unfolded on the evening of April 27, 2022. Many of these facts are uncontested, but the Court will identify where they are and construe all inferences in the light most favorable to Plaintiffs, as the nonmoving party.

### A. OCSD Conducts Training Exercise

On the evening of April 27, OCSD was conducting an in-house training on GPS surveillance and vehicle takedowns involving role-playing deputies in various scenarios. *See, e.g.*, Doc. 78 at 3; Doc. 157 at 2. Lieutenant Howard Griffin ("Griffin" or "Lt. Griffin"), a twenty-year veteran of the OCSD, was the supervising officer of this training exercise. Doc. 78 at 5; Doc. 106, FDLE E-Book, Interview with [hereinafter "Int. w/"] Lt. Howard Griffin at 1:05-10. The training began with several PowerPoint presentations, followed by practicing GPS installations in the parking lot, and concluded with conducting scenarios whereby trainees would attempt to surveil role-playing deputies without detection. Doc. 106, FDLE E-Book, Int. w/Lt. Howard Griffin at 2:35-3:30. Sgt. Koffinas was the lead instructor for the GPS portion of the training and Sgt. Yacoub was the lead instructor for the vehicle takedowns. *Id.* at 11:20-35. Griffin testified that "[t]here is no [actual] takedown in the scenario[,]" only a static demonstration in the parking lot. *Id.* at 3:15-35.

While role-playing during the scenario portion of the trainings, Det. Ricardo Galeana ("Galeana") and Det. Brady Bennett ("Bennett"), noticed a suspicious

vehicle—a black Audi with a piece of white paper covering its license plate—pull in and park at a Target in Kissimmee. Doc. 106, FDLE E-Book, Int. w/Det. Ricardo Galeana at 2:15-40. Galeana and Bennett then relayed this information to Griffin. *Id.* at 2:40-52

Yacoub testified in his deposition that training was supposed to last for ten hours that day, beginning at noon or 1:00 PM and scheduled through 10:00 or 11:00 PM. Doc. 93 at 7:2-14. However, Griffin came over the radio shortly before 7:00 PM, when it was still light outside, and instructed all deputies to "end scenario" and head over to the Target where the Audi had been observed. *Id.* at 8:19-9:10; Doc. 78-1 at 2. Griffin testified that "the class had been concluded[,] [s]o everybody at this point were trained [on the portion of tactical parking]."[7]  Doc. 82 at 16:1-8.

As Griffin ended the training, he instructed the deputies involved to "gear up[.]" Doc. 82 at 14:13-16. Many of the deputies participating in the training were in undercover clothing so "gear up" meant to ensure that they were wearing tactical vests emblazoned with the word "SHERIFF" on the front and back and had their weapons ready. *See, e.g., id.* at 14:16-22; Doc. 85 at 35:24-36:21; Doc. 93 at 7:22-8:4. Koffinas and Yacoub are pictured below, respectively, from the night of the incident:

---

[7] Det. Cole Miller ("Miller") testified that the training "was obviously cut short." Doc. 94 at 10:12-15.

 

Doc. 106, Melendez Photos, IMG_6925_redacted, IMG_6760_redacted.

### B. Surveillance of Plaintiffs

After being alerted to the suspicious Audi at the Target, Griffin ordered his deputies to secure the parking lot with "several vehicles on the outside, up and down, one on each end." Doc. 78-1 at 2:2-8. Galeana then radioed all deputies, describing the Audi and confirming that a black male with a black hoodie and COVID mask (later identified as Lowe) exited the vehicle, and that Bennett was following him on foot. *Id.* at 2:18-22. Galeana was unsure about their potential criminal motivations. *Id.* at 2:25-3:14 ("So I'm not sure if they're gonna hit for, like, electronics, or they're trying to hit the car next to them.").

As the deputies converged on the Target parking lot, Det. Cole Miller ("Miller") attempted to reach out to Target's lead Loss Prevention officer (who

Miller had prior experience with) but he was not working. Doc. 78 at 7. Miller eventually made contact with Alex McCreary ("McCreary"), who was the loss prevention representative on duty at the time, to share the description of the suspect. *See id.*; Doc. 78-1 at 5, 9; Doc. 94 at 17:12-17. Meanwhile, Bennett reported that there were in fact two suspects (later confirmed to be Lowe and Gomez) and both were Hispanic males, not black. Doc. 78 at 7; Doc. 78-1 at 6:5-19. McCreary reported that he was already watching them. Doc. 78-1 at 6:5-19.

While Lowe and Gomez were perusing the aisles of Target, a considerable effort was underway to secure the parking lot. Multiple individuals, including Griffin and Koffinas, can be heard over the radio instructing other deputies where to position themselves and their vehicles around the various locations in the parking lot, including the exits. *See, e.g.*, Doc. 78-1 at 6:14-7:2. Though a few of these deputies were positioned out of sight of the shooting incident, a total of 28 OCSD personnel were on scene at the Target parking lot by the time it occurred.[8] *See* Doc.

---

[8] Personnel included: Lt. Howard Griffin (senior officer in charge of training exercise and scene), Sgt. Scott Koffinas, Sgt. Ramy Yacoub, Sgt. Christopher Devlin (covering west side of Target), Sgt. James Lindbery (rear passenger in Dodge Ram), Sgt. Kyle Glynn (in Target parking lot), Det. Cole Miller (property crimes detective, talking to McCreary, passenger in Det. Olka's van), Det. Brady Bennett (at Target to setup for training and noticed Audi with Det. Galeana, followed suspects into Target on foot), Det. Jordan Fisher (driving Dodge Ram), Det. Tyler Fox (passenger in Det. Chris Koffinas' Dodge Caravan), Det. Ricardo Galeana (driver of Chrysler Pacifica, noticed suspicious Audi with Det. Bennett), Det. Kyle Gregory (driver of Nissan Pathfinder), Det. Chris Koffinas (driver of Dodge Caravan; brother of Defendant Scott Koffinas), Det. Matthew Olka (driver of Toyota Sienna), Det. Courtney Laverdiere (passenger in Det. Kyle Gregory's Nissan Pathfinder), Det. Desha Hernandez (responded to Target as a perimeter unit), Det. Ruth Marerro (repositioning vehicle during shooting), Det. Kristin Minervino (monitoring the rear of target, did not observe shooting), Det. Matthew Raymond (passenger of Det. Marerro), Det. Gustavo Solis

106, FDLE E-Book at 10-29. Griffin also had the STAR helicopter unit head towards the scene and standby. Doc. 78-1 at 4:8-9, 10:2-3, 10:24-25, 14:14-16.

Galeana continued to monitor the Audi closely, however its "blacked out" tint made it impossible to see whether anyone was inside. *Id.* at 5:5-8. Then, unprompted, Koffinas asked on the radio whether he could "help set up a front block" or whether there was "already a set up for [a] block in case they come running out?" *Id.* at 7:13-16. Galeana responded that he had not set up for a block, adding that he didn't have a great view of the Audi. *Id.* Yacoub responded immediately that "[w]e got it. We're about to back right behind [the Audi]. So we'll have the rear block, but you have to pull up for the front block." *Id.* at 7:25-8:2; *see also* Doc. 106, FDLE E-Book Radio Traffic Complete at 4:50-5:25.

After the deputies positioned themselves for a vehicle takedown on the Audi, Griffin reminded them that they "[j]ust need to confirm that they do the crime" and "[i]f not, [they]'ll just have to let them go." Doc. 78-1 at 8:19-22. Yacoub echoed similar sentiments shortly thereafter, stating that "[w]e're not taking it unless they have a crime right now…we could try to stop it regular and somebody spike it if

---

(passenger of Dep. Boyers, holstered his handgun and stood by due to the number of law enforcement personnel near the Audi), Det. Luis Sostre (rear passenger in Det. Olka's van), Det. David Speight (parked in lot, did not observe shooting), Det. William Delancey (passenger of Det. Speight), Det. Ryan Qualls (passenger of Dep. Boyers), Dep. Nuknson Atubel (called to help support as backup unit and containment perimeter, did not observe shooting), Dep. Gabriel Boyers (driving unmarked F-150, in parking lot but did not observe shooting), Det. Dustin Cowley (arrived on scene after shooting began, brought ballistic shield), and Dep. Javier Cruz (passenger of Det. Minervino, did not observe shooting). *See* Doc. 106, FDLE E-Book at 10-29.

tries to run, but we're not gonna block it right now." *Id.* at 9:16-19. At this point radio chatter indicated that Lowe and Gomez may have grabbed a pizza without paying for it and pocketed some Pokemon cards. *Id.* at 10:10-23.

Shortly thereafter, Griffin changed tack, telling Koffinas that he had "the green light to do the block, whether we can confirm [a crime] or not, the way they're set up and their covered tag[,] [t]hey're set up to try to flee."[9] *Id.* at 11:19-22. Griffin acknowledged there were enough deputies to execute the block and instructed the others to ensure they secured the perimeter so "if they run on foot we're[*sic*]—got every angle covered." *Id.* at 12:4-7. Lowe then exited the Target and got into the front passenger seat of the Audi, but Gomez remained in the store. *See id.* at 12:19-13:6.

Following Lowe's exit, Yacoub signaled to start the block, radioing "[g]o, Koffinas…[w]e're going to take it now[,]" before having to wait for two civilians to get out of the way. *Id.* at 13:24-14:4. But Griffin cut in to say that the crime hadn't been committed inside (changing tack *again*), to which Yacoub replied, "you don't want to take this car?" *Id.* at 14:7-8. Griffin responded that they need to confirm the

---

[9] After being instructed by Yacoub to keep his foot on the brake once he backed into the front of the Audi to block it, but just before being given the green light by Griffin, Koffinas acknowledged that the "hitch on the back [of his van] is probably going to tear their entire grill up." Doc. 78-1 at 11:4-12.

crime and that if Plaintiffs "go mobile" they would "just have to do surveillance until [they] can do a safe block somewhere else." *Id.* at 14:9-13.

Soon after, the Audi pulled out of the parking spot and began driving along the front of the store. *Id.* at 14:17-18. Griffin informed the STAR chopper that deputies were "[p]robably gonna pick them up at the front, so head this way, please." *Id.* at 14:15-16. The Audi continued to loop through the parking lot before parking in a different (handicap) spot close to the entrance. *Id.* at 14:14-15:18. After it backed into the new parking spot, the radio traffic indicates that Lowe momentarily got out of the Audi to check that the license plate was still covered. *Id.* at 15:19-24. Miller then radioed that Gomez was exiting the Target and confirmed that there had been a retail theft.[10] Doc. 78-1 at 16. Moments later deputies executed a vehicle takedown on the Audi (the "Takedown"). *See id.*

Approximately 20 minutes lapsed from the time that Griffin ended the training scenario to the time that deputies initiated the Takedown. *See* Doc. 106, FDLE E-Book, Radio Traffic Complete at 0:01-20:25. After preparing for roughly

---

[10] Miller testified in his deposition that when McCreary confirmed that Lowe and Gomez had stolen items from Target, he requested prosecution. Doc. 94 at 24:11-20. McCreary, however, testified that he did not have authority to make that decision and that "Target would never try to prosecute criminally for like petty [*sic*] theft like that." Doc. 89 at 73:5-74:4. This dispute is deepened by Koffinas' testimony to the FDLE interviewer that he remembered hearing that Target "desired prosecution…because if it wasn't then we're not gonna go any further with the block or attempted arrest or apprehension." Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 17:50-18:07. McCreary testified that Target's policy precluded it from prosecuting for thefts of merchandise under $100. Doc. 89 at 12:1-14:25, 73:17-25.

thirteen minutes to execute a parking block at the Audi's original location, deputies were forced to back off as the Audi spontaneously drove around the Target parking lot. *See id.* at 04:47-17:50; Doc. 78-1 at 14:17-15:18. Approximately ninety seconds after the Audi settled into the second (handicap) spot near the entrance, and without any further planning over the radio, OCSD deputies executed the Takedown. *See* Doc. 106, FDLE E-Book, Radio Traffic Complete at 19:00-20:25.

## C. The Scene

Before describing the details of the Takedown, it is first helpful to survey the scene and take inventory of the parties directly involved. The Audi had just parked in a handicap spot only a few spaces into a parking row almost directly across from the Target entrance. *See* Doc. 78-1 at 15:16-18. Inside the Audi were Baez (driver), Lowe (front passenger seat), Gomez (rear driver's side), and Joi (rear passenger's side). *See* Doc. 78 at 7; Doc. 157 at 3, n.1. Five OCSD vehicles played an active role in the Takedown—all were unmarked, undercover vehicles. *See id.* The following diagram, which shows the approximate *final* resting place of the vehicles, helps to conceptualize the Takedown:[11]

---

[11] The Court has edited this excerpt from the FDLE E-Book to show the general directional movement of the Audi from its starting position and to superimpose numbers on the vehicles to more clearly identify them. *See* Doc. 106, FDLE E-Book, Crime Scene Sketch at 227 (original).



*See* Doc. 106, FDLE E-Book, Crime Scene Sketch at 227.

| | **1. Dodge Caravan ("Caravan")** | **2. Dodge Ram 1500 ("Ram")** | **3. Toyota Sienna ("Sienna")** |
|---|---|---|---|
| **Driver** | Det. Chris Koffinas | Det. Jordan Fisher ("Fisher") | Det. Matthew Olka ("Olka") |
| **Passenger** | Det. Tyler Fox ("Fox") | Sgt. Ramy Yacoub | Det. Cole Miller |
| **Passenger 2** | | Sgt. James Lindbery ("Lindbery") | Det. Luis Sostre ("Sostre") |
| | | | |
| | **4. Nissan Pathfinder ("Pathfinder")** | **5. Chevrolet Express Van ("Express")** | **6.Chrysler Pacifica ("Pacifica")** |
| **Driver** | Det. Kyle Gregory ("Gregory") | Sgt. Scott Koffinas | Det. Ricardo Galeana |
| **Passenger** | Det. Courtney Laverdiere ("Laverdiere") | | Det. Brady Bennett[12] |

---

[12] Bennett was not in the Pacifica at the time of the Takedown. Doc. 106, FDLE E-Book at 81. After trailing Lowe and Gomez in the Target, he observed them return to the Audi and the ensuing Takedown—however, after he heard "approximately 10-15 gunshots [he] went back inside the Target for safety." *Id.*

The principal evidence of the Takedown takes the form of surveillance footage recorded from two cameras mounted on the exterior walls of the Target—neither includes any audio.[13] *See* Doc. 78 at 8. The "Primary Video" zooms in on the scene (from the North) behind the Audi just as the Takedown begins, however the camera's view of the shooting is obstructed by substantial tree cover. *Id.*; *see generally* FDLE E-Book, PTZ - Exterior 2 {AP 2050}-2022-04-27_ptz incident ("Primary Video"). The "Secondary Video" shows a more distant view of the scene from the East; however, this camera is lower resolution and the scene is also obstructed by trees and other vehicles. *See* FDLE E-Book, Exterior - PL Left 2 {AP 2001}-2022-04-27_19h00min MAIN ANGLE 2.

All other evidence derives from witness and expert testimony.[14]

### D. The Takedown

From this point forward, much is disputed. *See* Doc. 157 at 3, n.1 The Court reports these facts in the light most favorable to Plaintiffs, as the non-moving party, and notes disputes where they exist.

It begins with Gomez exiting the Target with stolen Pokémon cards and returning to the Audi, where he can be seen removing the paper covering the license

---

[13] Apparently, none of the deputies in the six vehicles involved were wearing body cameras. *See* Doc. 78 at 4.

[14] There was no radio chatter during the Takedown apart from a brief remark to Det. Olka and an acknowledgement of "shot[s] fired" some time later. Doc. 78-1 at 16.

plate before he gets back in. *See* Doc. 78 at 14; Doc. 78-1 at 16; *see also* Primary Video at 0:03-0:10; Secondary Video at 4:50-5:00; Doc. 106., FDLE E-Book, Int. w/Scott Koffinas at 17:17-23 ("I could see him remove that white paper that was covering the temp tag."). As Gomez walks around the back of the Audi to open the rear passenger (driver's side) door, Det. Olka's Sienna and Det. Fisher's Ram can be seen approaching the Audi. Primary Video at 0:05-0:10. No emergency lights are visible in the Primary Video on either the Sienna or the Ram as Gomez re-enters the Audi.[15] *Id.* at 0:05-0:13.

Defendants state that Det. Fisher's Ram simply blocked the Audi on the front passenger side; but Plaintiffs contend that the Ram "makes contact with the front of the Audi." Doc. 78 at 9; Doc. 157 at 4. Defendants' expert Steven Rundell ("Rundell") concluded that there was no evidence of such a collision and speculates that the visible movement of the vehicles in the Primary Video could be from Yacoub exiting the Ram and Gomez entering the Audi. Doc. 100-1 at 29-30. However, Plaintiffs' expert Toby Terpstra ("Terpstra") opined that Rundell's computer model positioned the vehicles in error and that the Ram "actually

---

[15] Defendants state in their motion that "[b]lue lights were activated" when Det. Olka's Sienna pulled up on the Audi. Doc. 78 at 9. However, they elsewhere concede that the emergency lights actually came on "*within two seconds* of the Audi brake lights coming off"—in other words, they were off until after the Audi began moving forward. *Id.* at 13, n.4 (emphasis added). The Primary Video plainly shows the Audi moving forward before the Sienna's emergency lights are activated. Primary Video at 0:12-0:14.

impacted the Audi approximately 0.4 seconds prior to the forward motion of the Audi." Doc. 95-1 at 5.

The Primary Video shows the vehicles rocking but it is not clear whether the Ram impacts the Audi. Primary Video at 0:11-0:13. Yacoub, however, who was in the Ram, testified that it "made contact" with the Audi. Doc. 106, FDLE E-Book, Int. w/Sgt. Ramy Yacoub at 7:40-:58. In fact, he stated that "I don't get out of the car until they make contact." 25:33-25:36. For the purposes of Defendants' motion, the Court finds that a reasonable jury could find that the Ram struck the Audi.

Moments after the impact, the Audi accelerated forward.[16] *See* Primary Video at 0:11-0:13. Almost simultaneously, Yacoub opened the Ram's passenger door to exit and "order the occupants out."[17] Doc. 78 at 10; Doc. 95-1 at 9 ("[T]he front passenger door of the Dodge Ram can be seen opening approximately 0.3 seconds prior to the Audi's forward motion."). The open passenger door of the Ram would have been in Baez's field of vision; however, it is unclear from the surveillance

---

[16] Fisher testified in an interview with FDLE that when the Audi accelerated forward he "reached down to turn [his emergency] lights on." Doc. 106, FDLE E-Book, Int. w/Det. Christopher Koffinas at 4:09-4:15. Fisher acknowledged, however, that he may have only activated the rear emergency lights (and not the front), but he heard a click, indicating that one of them was on. *Id.* at 4:15-4:24.

[17] Yacoub testified in an interview with FDLE a few weeks after the incident that he had yelled "Sheriff's Office" when he exited the Ram, but did not hear any response. Doc. 106, Int. w/ Sgt. Ramy Yacoub at 30:50-31:18.

videos where Yacoub was located at this point in time and whether he (or his vest) would have been visible to Baez.[18]  *See* Doc. 95-1 at 9; 100-1 at 32.

The Audi's forward acceleration quickly caused it to contact Det. Olka's Sienna (driver's side). *See* Primary Video at 0:13-0:15; Doc. 78 at 11; Doc. 157 at 4. Terpstra calculated that the Audi had been in forward motion for 1 second before the Sienna's emergency blue lights were activated—it impacted the Sienna 1.3 seconds later. Doc. 95-1 at 8. A single blue light in the driver's side rear window would have been visible in Baez's field of vision after it came on.[19]  *Id.*; Doc. 100-1 at 29-30.

While the Audi was scraping along the driver's side of the Sienna, Yacoub testified that his back was up against the Ram and that the passenger door was already closed.[20] Doc. 106, FDLE E-Book, Int. w/Sgt. Ramy Yacoub at 27:36-27:55. Despite not seeing Det. Olka or any of his passengers, Yacoub testified that at this

---

[18] Terpstra concluded that Yacoub "is not visible in the surveillance video and for this reason his location and orientation throughout the sequence is unknown." Doc. 95-1 at 13.

[19] The Court notes that a similar emergency blue light is available to the public for purchase on the Internet for $31.95. *See FlareAlert Pro Battery Powered LED Emergency Beacon, Blue, BBP.2*, GLOBAL INDUSTRIAL, (last visited on January 12, 2026) https://www.globalindustrial.com/p/flarealert-pro-battery-powered-led-emergency-beacon-blue-bbp2?gad_source=1&gad_campaignid=22985456047&gclid=Cj0KCQiA1JLLBhCDARIsAAVfy7harFp2tbrm2kLqpKLMLynKlwKE891OZijFXKepvq253ENQRXpRXoIaAg3wEALw_wcB.

[20] Yacoub later testified in deposition that he did not recall crouching down at all, nor whether he closed the door or whether the Audi struck it and closed it. Doc. 93 at 34:22-35:2.

point in time, "in my mind, I'm thinking, shit, [Olka's] under the vehicle, he's

getting run over currently." *Id.* at 26:40-26:55.

More contested facts arise in regard to the Audi's next (and final) movements.

Defendants maintain that the Audi was "*driven* in a manner that a reasonable

deputy would…find threatening[,]" but Plaintiffs insist that the Audi was

"redirected to the right" by its impact with the Sienna and the other OCSD vehicles.

Doc. 159 at 4; Doc. 157 at 5; *see also* Doc. 95-1 at 13 ("Based on video analysis and

photogrammetry, it is not clear that Mr. Baez turned the vehicle to the right, or if

the vehicle was redirected to the right through impacting the driver's side of the

Toyota Sienna and the contact on the front right of the Dodge Ram."); Doc. 100-1 at

33 (Rundell opines that "Baez chose to drive and turn toward the open [Ram]

passenger door, heading toward a location where a pedestrian would logically be

expected."). Terpstra, however, recognized that photographs of the Audi at rest

"show the tire and wheels in a relatively straight position."[21] Doc. 95-1 at 13; *see*

Doc. 106, Nguyen Photos–Crime Scene at IMG_0086.JPG, IMG_00174.JPG.

After the Audi moves towards the right—by Baez's volition or through

redirection—Yacoub testified that he discharged his firearm, perceiving his life to

be in danger. Doc. 106, Int. w/Sgt. Ramy Yacoub at 27:40-28:30. Yacoub shot at the

---

[21] Based on this (and other) evidence, a reasonable jury could find that the Audi was
redirected to the right by the crashing vehicles.

driver of the Audi 17 times through the passenger window, emptying his magazine. *Id.* at 29:26-29:34, 32:24-33:45. Once the Audi was stopped, Yacoub ducked back behind the Ram to reload his firearm. *Id.* at 28:35-29:40

Around this time, the Audi's right front end came into contact with the Dodge Caravan (driven by Det. Chris Koffinas), which definitively halted its forward progress.[22] *See supra* at 12 (scene diagram); Doc. 78 at 15; Doc. 157 at 5; Primary Video at 0:14-0:17. Yacoub testified that his shots were what stopped the Audi's forward motion, however, Chris Koffinas' testimony suggests that shots were fired *after* his Dodge Caravan smashed into the Audi's front end. *Compare* Doc. 106, Int. w/Sgt. Ramy Yacoub at 28:28-:35 *to* Doc. 106, FDLE E-Book, Int. w/Det. Christopher Koffinas at 2:27-4:36 (describing that he effectuated the block and then ducked down for cover when he heard gunshots). The Audi then appears to be impacted by the Nissan Pathfinder driven by Det. Gregory shortly after being stopped by the Dodge Caravan.[23] *See* Primary Video at 0:18-0:20; Doc. 106, FDLE E-Book, Int. w/Det. Kyle Gregory at 03:16-3:26 ("I seen [*sic*] the suspect vehicle still

---

[22] Chris Koffinas testified in an interview with FDLE that he did not activate the emergency lights in the Dodge Caravan and did not remember if any others were activated at the scene. Doc. 106, FDLE E-Book, Int. w/Det. Christopher Koffinas at 3:23-3:31. Chris Koffinas also testified that he didn't hear any verbal commands being given. *Id.* at 4:02-:08.

[23] Recalling the diagram, Gregory's Pathfinder impacted the Audi perpendicular (from the left) to its forward direction of travel, which would have likely pushed the Audi even further towards the right. *See supra* at 12.

pushing through the cars, so that's when I came in and hit it on the driver's left front bumper.").

It is undisputed that no more than 3.5 seconds elapsed between the time the Audi began its forward acceleration to the moment it came to a halt after crashing into the Dodge Caravan. *See* Doc. 78 at 13; Doc. 100-1 at 15; Doc. 157 at 15. Pre-crash data further shows that in the last 1.5 seconds before striking the Dodge Caravan, the Audi's accelerator pedal was 99% depressed—though the peak speed reached was 8 miles per hour. *See* Doc. 100-1 at 15. The following table shows this progression:

### Pre-Crash Data -5 to 0 sec (Record 1, Most Recent)

| Time (sec) | Speed, Vehicle Indicated (MPH [km/h]) | Accelerator Pedal (%) | Service Brake Activation |
|---|---|---|---|
| -5.0 | 0 [0] | 0 | On |
| -4.5 | 0 [0] | 0 | On |
| -4.0 | 0 [0] | 0 | On |
| -3.5 | 0 [0] | 52 | Off |
| -3.0 | 1 [1] | 31 | Off |
| -2.5 | 1 [1] | 58 | Off |
| -2.0 | 4 [7] | 76 | Off |
| -1.5 | 2 [3] | 99 | Off |
| -1.0 | 4 [6] | 99 | Off |
| -0.5 | 7 [12] | 99 | Off |
| 0.0 | 8 [13] | 99 | Off |

*Id.*

Meanwhile, Koffinas had pulled up behind where the Audi was initially parked and can be seen in the Primary Video exiting the Express van shortly after the Audi has crashed into the Sienna. Primary Video at 00:14. The video shows Koffinas quickly draw his firearm and walk briskly toward the scene, stopping in

the center of the parking spot that the Audi had occupied moments earlier. *Id.* at 00:14-00:20. He then remains standing in the parking spot with his firearm pointed towards the Audi until other deputies stream onto the scene and the suspects begin to be pulled from the vehicle nearly thirty seconds later. *Id.* at 00:20-00:48.

Koffinas testified to FDLE that when he got out of the Express he saw Yacoub standing by the Ram for a "split-second" and that Yacoub "had a little bit of cover" before the Audi "blasted through and then [Koffinas] didn't see Yacoub anymore." Doc. 106, FDLE E-Book, Int. w/Sgt. Scott Koffinas at 26:20-46, 28:16-25. It was at this point that he fired his weapon—14 rounds—into the rear window of the Audi, aiming solely for the driver.[24] *Id.* at 26:40-48, 30:20-40, 39:20-45. Koffinas told FDLE that he fired before the vehicle had come to a stop because he thought that Yacoub was underneath the Audi. *Id.* at 26:48-27:13.

Neither Yacoub nor Koffinas seem to have been aware of Chris Koffinas' Dodge Caravan or Gregory's Nissan Pathfinder until sometime after they fired their weapons. *See* Doc. 106, FDLE E-Book, Int. w/Sgt. Ramy Yacoub at 28:46-:55; Doc. 106, FDLE E-Book, Int. w/Sgt. Scott Koffinas at 29:33-46 ("It went so fast I couldn't

---

[24] Koffinas testified to FDLE that he did not have time to shout any warnings before discharging his firearm, but that he saw Det. Olka's emergency lights on, had his SHERIFF vest on, and heard others shouting commands. Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 36:34-37:14.

tell you when these two pinched the vehicle in. If Chris didn't hit it, it could've taken off through the parking lot.").

After the Audi came to rest (pinned by Chris Koffinas' Dodge Caravan), deputies began to remove the Audi's occupants. At this stage, multiple deputies were shouting at the suspects in the Audi to "get out of the vehicle" and "show me your hands." *See, e.g.*, Doc. 106, FDLE E-Book, Int. w/Det. Desha Hernandez at 6:35-52; Int. w/OCSO Lt. Howard Griffin at 13:18-54 ("There was a lot of yelling…I could hear them yelling 'Sheriff's Office' and at one point I actually, when I walked up there I said, 'only one person with the commands.' ").

Scott Koffinas and Det. Dustin Cowley then approached the driver's door and called out to the occupants—Joi, who opened his door and crawled out, was the first to leave the Audi. *See* Doc. 106, FDLE E-Book, Int. w/Sgt. Scott Koffinas at 32:03-16. Gregory detained Joi, who testified that the deputy who hand-cuffed him slammed him on the ground and cut his chin.[25]  Doc. 84 at 64:15-65:23; FDLE E-Book, Int. w/Dep. Kyle Gregory at 4:55-5:15. Koffinas and the other deputies, including Det. Desha Hernandez ("Hernandez"), next shouted commands to Gomez to crawl

---

[25]  The Primary Video shows what appears to be the first individual exit the Audi and walk slowly with his hands raised towards waiting officers. Primary Video at 0:44-0:50. An officer in a red t-shirt (but no tactical vest) can be clearly seen grabbing the individual's arm and forcefully slamming him to the pavement where he and another officer take some time to secure him. *Id.* at 0:54-1:19. The red-shirted officer then drags him over by the hands (which are cuffed behind his back) and throws him down on a grass median behind a white car before searching him. *Id.* at 1:19-30.

out of the Audi.[26] Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 32:17-50. Hernandez handcuffed him after he did so and stayed with him through his transportation to the hospital. Doc. 106, FDLE E-Book, Int. w/ Det. Desha Hernandez at 3:55-4:30; *see also* Doc. 81 at 93:17-94:2.

Meanwhile, Lowe recognized law enforcement officers for the first time in the rear window and out the door which Gomez had crawled out of as they were shouting at him to turn the car off and get out. Doc. 88 at 119:8-23. Despite his fingers being shot, he was able to turn off the car and crawl out. *Id.* at 120:13-16. Gregory noticed Lowe crawling out of the Audi and dragged him out by the hood of his sweatshirt before handcuffing him.[27] Doc. 106, FDLE E-Book, Int. w/ Dep. Kyle E. Gregory at 5:15-26. Sgt. James Lindbery ("Lindbery") then grabbed Baez and pulled him to the rear of the vehicle.[28] Doc. 106, FDLE E-Book, Int. w/ Sgt. James Lindbery at 5:45-6:13.

---

[26] Around this time, at least 15 OCSD deputies can be seen walking around the scene, some with shields, many pointing their weapons towards the Audi and hiding under cover—and some clearly gesturing and shouting towards members of the public to stay back. *See, e.g.*, Primary Video at 1:25-2:02. Indeed, some deputies appear to be running towards the Target with guns drawn. *Id.* at 2:02-2:10.

[27] Though Gregory noticed Lowe had injuries to his fingers (and heard Lowe screaming that they hurt), he cuffed him behind the back at first before being directed by another detective to cuff him around the front of his body to control the bleeding. Doc. 106, FDLE E-Book, Int. w/ Dep. Kyle E. Gregory at 5:27-6:15. Gregory then helped him keep his hands elevated until fire rescue arrived at the direction of another detective. *Id.*

[28] Lindbery testified that when he initially pulled Baez (who was unconscious) out of the Audi "a firearm [fell] somewhere from his person." Doc. 106, FDLE E-Book, Int. w/ Sgt. James Lindbery at 7:00-32. However, neither Yacoub nor Koffinas testified to any knowledge that the

## E. The Aftermath

An otherwise unremarkable spring evening in the Kissimmee Target parking lot erupted into a scene of deadly chaos at 7:06 PM on April 22, 2022. *See* Primary Video at 0:00-0:20. Target surveillance videos show dozens of customers, including children and families, in the immediate vicinity suddenly sprinting away from the scene in terror with many appearing to seek shelter in the store.[29] *See* Doc. 106, FDLE E-Book, Exterior - Main Entrance Grocery {AP 2009}-2022-04-27_19h00min CARDS EXIT at 4:53-5:30. Eleven 9-1-1 calls evinced terrified civilians, unsure of who was firing or where to go for safety. *See* Doc. 106, FDLE E-Book at 8-10. This confusion ensued in spite of the fact that OCSD had at least 28 deputies at the scene.[30] *See supra* at note 8.

---

occupants of the Audi were armed before they used lethal force and Defendants make no mention of this firearm anywhere in their briefing. *See* Doc. 93 at 16:6-15; Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 40:53-41:30; *see also generally* Doc. 78; Doc. 159. Therefore, the Court affords it no further consideration. *See Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) ("[T]he "mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit[.]") (internal quotations and citations omitted).

[29] One innocent bystander can be seen trying to sprint away from the gunfire only to be himself confronted at gunpoint by OCSD deputies, who appear to wander away from him after a short time, leaving him lying on the ground with his hands up. *See* Exterior - Drive Up Parking {AP 480}-2022-04-27_19h00min at 5:00-5:40.

[30] In his deposition, Miller stated in response to a question regarding whether there were any other marked patrolmen on site at Target that day by stating that "[e]ventually I saw, you know--half the state of Florida in the parking lot." Doc. 94 at 21:6-13.

At its end: no members of the OCSD were injured; at least five vehicles were badly damaged, including the Audi and four OCSD undercover vehicles; Yacoub had fired seventeen rounds into the passenger window; Koffinas had fired fourteen rounds into the rear window; Baez was shot dead; Gomez was shot three times in the back and ribs; Lowe suffered gunshot wounds to both hands resulting in permanent disfigurement; Joi was slammed to the ground and detained for hours; countless civilians were traumatized; and a pizza and a handful of Pokémon cards were recovered. *See* Doc. 106, FDLE E-Book at 4 (summary of events), 7-9 (9-1-1 Calls), 45-47 (crime scene photos of damaged vehicles), 154-77 (Osceola County Fire Rescue medical records), 195 (Baez's medical examiner report[31]), 273-74 (OCSD round count of Yacoub and Koffinas' firearms); Doc. 32, ¶ 35; Doc. 84 at 68:8-69:16. None of the Plaintiffs were prosecuted for any crime as a result of these events. *See* Doc. 85 at 18-22.

On May 4, 2022, former Osceola County Sheriff Marcos Lopez ("Lopez") stated to the press that, "I believe my deputies are justified in all their actions" and

---

[31] Baez's body can be seen as it is dragged out of the Audi and placed on the ground. Primary Video at 5:57-6:05. Then, some deputies walk away and attend to other duties on the scene, sometimes appearing to be standing relaxed next to the body taking no action. *See id.* at 6:05-7:50. It is not until around 90 seconds later that Lindbery can be seen walking back over and raising his arms towards the other deputies before kneeling to begin chest compressions. *Id.* It is nearly fifteen minutes into the Primary Video when a fire truck can be seen arriving and, shortly afterward, what appear to be paramedics taking over care. *Id.* at 14:20-15:30. Notably, Baez was not pronounced dead at the scene but later at the hospital. Doc. 106, FDLE E-Book at 52.

"I have the utmost, 200% trust in everything they do based on their training and their experience." Doc. 32, ¶ 96.

## F.  Procedural Posture

On May 16, 2025, Defendants initially filed their Motion for Summary Judgment. Doc. 78; *see also* Docs. 78-101. However, on June 30, 2025, Plaintiffs requested the Court stay its deadline to respond to Defendants' Motion as a result of former Sheriff Lopez's June 5th arrest on federal racketeering charges and suspension from his official duties. *See* Doc. 114, ¶ 8; Doc. 115. After several continuances were granted to account for discovery delays, the Court reset the briefing schedule for Defendants' Motion for Summary Judgment and amended the Case Management and Scheduling Order, resetting the deadlines for all remaining pretrial matters and the trial date.[32] *See* Doc. 149; Doc. 150; Doc. 155; Doc. 156.

On October 31, 2025, Plaintiffs filed their Response and Defendants filed their Reply two weeks later.[33] Doc. 157; Doc. 159. Doc. 157; Doc. 158. The matter is ripe for adjudication.

---

[32] Relatedly, Defendants filed a *Daubert* Motion to exclude the expert opinion testimony of Plaintiffs' expert witnesses Toby M. Terpstra ("Terpstra") and Jeronimo "Jerry" Rodriguez ("Rodriguez"). Doc. 111; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). On October 9, 2025, the Court denied Defendants' Motion as to Rodriguez. Doc. 144. Then on December 2, 2025, the Court denied Defendants' Motion as to Terpstra in part, granting the Motion for the limited exclusion of Terpstra's testimony regarding potential muzzle gas near Sgt. Koffinas' firearm in the Primary Video. Doc. 161

[33] On December 10, 2025, Defendants filed a Notice of Supplementary Authority that the Court has likewise considered. Doc. 163.

## II.    Legal Standard

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458–59 (11th Cir. 1994).

## III.    Analysis

### A. Excessive Force Claims

Sergeants Yacoub and Koffinas move for summary judgment on Counts I-VIII of the Complaint arguing their use of force was constitutional and they are entitled to qualified immunity. Doc. 78 at 18. Plaintiffs counter that the Deputies' use of force was objectively unreasonable and that they are not entitled to qualified immunity. Doc. 157 at 7-9.

The defense of qualified immunity "protects government officials performing discretionary functions from civil litigation and liability if their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1296 (11th Cir. 2025). To invoke qualified immunity, public officials must first prove that they were "acting within their discretionary authority" when the acts of which plaintiffs complain were performed. *Id.* at 13. If they succeed, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.* (internal quotations and citations omitted) (emphasis original). To defeat qualified immunity, plaintiffs must establish that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Aguirre*, 158 F.4th at 1296.

It is undisputed that Yacoub and Koffinas were "acting within their discretionary authority" during the events underlying Plaintiffs' Complaint. *See* Doc. 78 at 18; Doc. 157 at 7-8. Therefore, the question here is whether Plaintiffs have met their burden to show that the Deputies are not entitled to qualified immunity. Notably, "[e]ach official who asserts qualified immunity is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Aguirre*, 158 F.4th at 1296.

**1. Violation of Plaintiffs' Fourth Amendment Rights**

"A claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment." *Barnes v. Felix*, 605 U.S. 73, 79 (2025) (internal quotations and citations omitted). As courts have long held, the operative question in such cases is "whether the force deployed was justified from the perspective of a reasonable officer on the scene, taking due account of both the individual interests and the governmental interests at stake." *Id.*

In order to answer this question, courts must analyze the totality of the circumstances, and in doing so "slosh [their] way through a factbound morass." *See id.* at 80. As the Supreme Court recently emphasized in *Barnes*, the "totality of the circumstances" inquiry "has no time limit" and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* at 80-82. Factors which courts consider include, but are not limited to: the severity of the crime, actions the officer took during the stop ("such as giving warning or otherwise trying to control the encounter"), and "the stopped person's conduct is always relevant." *Id.*; *see also Graham v. Connor*, 490 U.S. 386, 396 (1989).

As a threshold matter, Defendants argue that Joi was not seized under the Fourth Amendment because "he was not struck." Doc. 78 at 36. However, because he was in the car when it was "stopped" by police and fired into, Joi was unquestionably "seized"—along with Gomez and Lowe—for the purposes of this

matter. *See Brendlin v. California*, 551 U.S. 249, 257 (2007). Therefore, the following analysis applies to all Plaintiffs.

*    *    *

Considering the totality of the circumstances surrounding the Takedown and its execution, a reasonable jury could conclude that, based on the undisputed record evidence (construing disputed facts in favor of Plaintiffs), Yacoub and Koffinas' actions were excessive and unreasonable.

The justifications for this conclusion are many, but they begin with the severity of the crime—here, petit theft and a "non-criminal" traffic violation. *See, e.g.*, Doc. 82 at 14:2-12. The severity of the crime which predicated the stop "can carry weight in the analysis."[34] *Barnes*, 605 U.S. at 80. However, the severity of the initial underlying crime can be overshadowed by subsequent criminal conduct. In *Spencer v. City of Orlando*, an initial stop for a seatbelt violation did not occasion the officers' use of deadly force—it was the suspect's ensuing aggravated assault evidenced by aggressively backing towards an officer, hitting the officers' car, and speeding away that grounded the constitutional use of deadly force. 725 F.App'x 928, 931-32 (11th Cir. 2018) (unpublished).

---

[34] For instance, in *Salvato v. Miley*, the suspect was initially seized for simply "yelling and cussing" at passing cars and was eventually shot by officers despite being unarmed and in the act of retreating. 790 F.3d 1286 at 1293. The officers' use of force was held to be "clearly unreasonable." *Id.* at 1293-94.

The present incident began when Galeana radioed in to notify Griffin that he saw the Audi with its license plate covered and suspicious individuals exiting to go into Target. *See* Doc. 78-1 at 2:2-3:11. Plaintiffs do not dispute that their initial conduct and the presentation of the Audi "were enough to warrant a simple traffic stop."[35] Doc. 157 at 10. It is likewise undisputed that there was "probable cause to arrest Gomez and Lowe [] for retail theft" after they emerged from Target.[36] Doc. 78 at 23.

The severity of these crimes does not justify the magnitude of OCSD's response—diverting an undercover, 28-deputy battalion and helicopter to conduct a simple stop on a parked vehicle containing two petit thieves.[37] *See Barnes*, 605 U.S. at 80; *Patel*, 959 F.3d at 1340 ("Proportionality is preeminent in the excessive-force context, and a reasonable jury could conclude that the swift and decisive force

---

[35] The Court notes, however, that black-out tinted vehicles backed into parking spaces with the engines running are all too commonplace in central Florida—it was the Audi's covered license plate and the actions of its occupants which provided the basis for reasonable suspicion that a crime may be committed.

[36] Plaintiffs do not dispute this fact, but the Court recognizes that McCreary and Miller's testimony do not align regarding whether Target sought prosecution for these thefts. *See supra* at note 10. Defendants still had sufficient reasonable suspicion to stop the Audi based on the covered license plate, but crediting McCreary's testimony for the purposes of this motion, it is notable that Target would not seek prosecution for Plaintiffs' petit theft. *See* Doc. 89 at 73:5-74:4.

[37] In actuality, the initial surveillance of the Audi was primarily based on the covered license plate—it was not until over 12 minutes into their stakeout that there was any indication they were committing retail theft. *See* Doc. 78-1 at 10:14-16; Doc. 106, FDLE E-Book, Radio Traffic Complete at 12:32-45.

Parker employed was drastically in excess of what Patel's minor movements warranted."). This hastily convened OCSD posse deployed itself to contain the Audi and proceeded to execute the kind of operation one would expect at the conclusion of a serious years-long undercover case, not a simple traffic stop. *See* Doc. 82 at 14:2-12.

The underlying crimes in this case were *not* "crime[s] involving the infliction or threatened infliction of serious physical harm."[38] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see* Doc. 78 at 23; Doc. 78-1 at 10:14-23. Thus, it is clear in the first instance that employing deadly force to prevent Plaintiffs' escape based on these crimes would not have been reasonable. *See* Doc. 82 at 14:2-12.

Nevertheless, a series of reckless and unreasonable decisions made by OCSD deputies—led by Yacoub and Koffinas—resulted in just that occasion. The Takedown was organized, planned, and carried out by multiple senior, experienced deputies.[39] Lt. Griffin, who had twenty years' experience with OCSD, was leading the training exercises prior to the Takedown and gave the order to end training and

---

[38] Radio chatter confirms that the deputies on scene, including Yacoub and Koffinas, were aware that the suspects were only alleged to have stolen a pizza and Pokémon cards. Doc. 78-1 at 10:14-23. Yacoub even stated: "See if the Pokémon cards end up being a felony. We'll see." *Id.* at 11:13-14.

[39] Many of the cars had senior officers like Yacoub, Miller, or Koffinas in them and were then paired with newer detectives as part of the training exercise. *See, e.g.*, Doc. 93 at 6:20-7:1; Doc. 94 at 5:14-6:19.

mobilize to the Target. Doc. 106, FDLE E-Book at 77. Yacoub had been the lead

instructor for the vehicle takedown portion of the training and Koffinas the lead

instructor for the GPS training—both had over ten years of experience at OCSD. *Id.*;

*see also supra* at note 3, note 4. And the radio traffic makes clear that both Yacoub

and Koffinas played a leading role in preparing for (and initiating) the Takedown

and securing the scene.[40] *See, e.g.*, Doc. 78-1 at 6:14-7:16; *supra* at sec. I.b.

Inexplicably, Lt. Griffin gave several contradictory orders throughout the

preparation for the Takedown; indeed, it is unclear whether Yacoub and Koffinas

even had authorization to proceed with a block. When they were planning to block

the Audi at its first location, Lt. Griffin interjected to remind them if Plaintiffs did

not commit a crime they would "just have to let them go." Doc. 78-1 at 8:19-22.

Yacoub agreed with this conclusion, but then a few minutes later Lt. Griffin came

on and told Koffinas that he had a "green light to do the block, whether we can

confirm [a crime] or not." *Id.* at 11:19-22. Just as Yacoub was giving the command

to move in on the Audi in its first location, however, Lt. Griffin again interjected to

---

[40] It is unclear whether any of the trainees—like Olka—had any real experience conducting a vehicle takedown or parking block before. *See* Doc. 94 at 5:14-6:19. Griffin testified in his deposition that training had been completed and all trainees were certified when it came to tactical parking; however, Griffin also testified that "there is no takedown in the [training] scenario, it's literally just following other detectives that are role players in the scenarios and trying to GPS their vehicles [and] follow them around." *See* Doc. 106, FDLE E-Book, Int. w/ Lt. Howard Griffin at 3:30-50. The only physical training conducted on vehicle takedowns was a static demonstration in the parking lot of what the PowerPoint instructed. *Id.* at 3:15-26.

say that no crime had been confirmed and they would just have to do surveillance if Plaintiffs went mobile "until [they could] do a safe block somewhere else." *Id.* at 13:24-14:13.

Griffin is not identified as speaking again on the radio before (what the Court has identified as) Yacoub gave the command to Olka to block the driver's side of the Audi. [41] *See generally* Doc. 78-1 at 14-16. Although Griffin testified that he approved the block, it is up to jurors to determine the credibility of his testimony. *See, e.g.*, Doc. 82 at 16:9-12. In any event, a reasonable officer in Lt. Griffin's shoes would have given clear orders concerning whether deputies under his command had authorization to conduct a vehicle takedown under these circumstances. Nonetheless, Griffin's final radio transmission was clear enough—if the Audi moved from its original parking space (as it did) they would "just have to do surveillance" until they could safely perform a block. *See id.* at 14:9-15.

Instead, Yacoub (without being directed to) led his team of senior officers and trainees into the hastily and ineffectively executed Takedown. Griffin, Yacoub, and Koffinas had spent approximately 13 minutes setting up for and preparing to perform a vehicle takedown on the Audi in its original parking space, delegating

---

[41] Lt. Griffin testified that he couldn't see anything while he was setting out spike strips (but he could hear the radio) and the next thing he hears is the vehicles crunching as the Takedown was initiated, then shots. Doc. 106, FDLE E-Book, Int. w/Lt. Howard Griffin at 7:25-8:08.

each deputy's role and directing where they should position their cars. *See* Doc. 106, FDLE E-Book, Radio Traffic Complete at 04:47-17:50; Doc. 78-1 at 7:25-12:12. But after the Audi unexpectedly moved to a new parking space, Yacoub can be heard *only 90 seconds* later ordering Olka to "take the driver's side" and that "we're taking the front" as the Takedown began without any further preparation.[42] *Id.* at 19:00-20:25.

The result was that neither Olka's nor Fisher's vehicles actually blocked the Audi and it was able to maneuver forward between them before being impeded by Det. Chris Koffinas' Dodge Caravan. *See supra* sec. I.d. Both Yacoub and Koffinas, however, testified to essentially being oblivious to the fact that Det. Chris Koffinas was part of the block. *See* Doc. 106, FDLE E-Book, Int. w/ Sgt. Ramy Yacoub at 28:46-:55; Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 29:33-46. And Yacoub even admits that the sloppy execution of the Takedown resulted in a "crossfire issue" whereby deputies needlessly put themselves in harm's way.[43] Doc. 93 at 66:5-67:3.

---

[42] The Court recognizes that this line in the Radio Traffic Transcript is identified as being spoken by an "unidentified speaker." Doc. 78-1 at 16:7-9. It seems clear to the Court, however, that it is Yacoub's voice, based on the other chatter identified as his in the Radio Traffic Transcript. *See, e.g.*, Doc. 106, FDLE E-Book, Radio Traffic Complete at 17:50-18:10; Doc. 78-1 at 14:17-:22. In any event, there is a disputed issue of fact regarding who gave that final order and, in the light most favorable to Plaintiffs, a jury could find that it was Yacoub's voice. *See, e.g.*, Doc. 78-1 at 13:24-14:4 (Yacoub leading the initial attempt to block the Audi).

[43] Yacoub assures that once they realized this issue it "was almost immediately addressed." Doc. 93 at 66:5-7. However, several deputies testified to having no idea who was firing or where the bullets were coming from during the Takedown, with many taking cover. *See, e.g.*, Doc. 106, FDLE E-Book, Int. w/James Lindbery at 9:44-:49 ("I could not tell you who was shooting or

However, the Deputies' most significant failure that day—and the key distinguishing fact in this case—was that *none* of these deputies, including Yacoub (who led the block) and Koffinas, activated their emergency lights or sirens, *despite* knowing that they were all in undercover vehicles wearing undercover clothing. No reasonable officer would have initiated the Takedown without any notice or warning that they were law enforcement. And, more importantly, under these circumstances no reasonable officer would have so recklessly employed deadly force (as Yacoub and Koffinas did) to prevent the escape of two petit thieves.

*Garner* counsels that deputies may use deadly force "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm...**and if, where feasible, some warning has been given**." 471 U.S. at 11-12. "The feasibility of a warning is dependent on many variables, two of which are the proximity of the danger to the officer or others and the time available to the officer." *Pipkins v. City of Hoover, Alabama*, 134 F.4th 1163, 1172 (11th Cir. 2025).

First, as to the issue of emergency lights, it is obvious that both of these factors weigh heavily against Yacoub and Koffinas. Unlike many use of force cases, including *Pipkin*, there was no latent "danger" present in the instant stop, no

_____

anything like that.").

individual carrying a weapon with probable cause to use it or any threat of that nature. *See* 134 F.4th at 1173. Just a vehicle with its tag covered (until right before the Takedown), and a couple of individuals who had likely stolen a pizza and some Pokémon cards. *See* Doc. 78 at 14; Doc. 78-1 at 10-11. Defendants have identified no exigency whatsoever (or other explanation) in support of their failure to clearly deploy emergency lights and/or sirens. *See, e.g., supra* sec. I.b.

Instead, Defendants argue in their Motion only about warning in the context of the instant before Yacoub and Koffinas fired, but "those later, in-the-moment facts cannot be hermetically sealed off from the context in which they arose." *Barnes*, 605 U.S. at 80. These arguments offer little persuasive value, but even if they did, they are secondary to the Deputies' principal failure to identify themselves as law enforcement before initiating the Takedown.[44]

Yacoub testified that when he exited the Ram he yelled, "Sheriff's Office!" Doc. 106, FDLE E-Book, Int. w/ Sgt. Yacoub at 25:25-30. But Chris Koffinas testified that he did not hear any commands. Doc. 106, FDLE E-Book, Int. w/ Det. Christopher Koffinas at 4:02-:08. And Olka reports only hearing the word "gun" shouted by someone. *See* Doc. 106, FDLE E-Book at 103. Fisher's (driver of the Ram)

---

[44] Both Deputies at least appeared to be wearing their "SHERIFF" emblazoned tactical vests. *See supra* at 5. However, in his interview after the shooting, Gomez only remembered seeing "one guy" in front of the Audi who "looked like a civilian with a gun." Doc. 106, FDLE E-Book, Int. w/ Michael S. Gomez at 8:35-9:05.

testimony supports Yacoub's, but Lindbery—who was in the rear passenger seat of the Ram and exited at the same time as Yacoub—only remembered getting out of the truck and almost immediately hearing gunshots.[45] *Id.* at 90-91; Doc. 106, FDLE E-Book, Int. w/ James Lindbery at 4:50-5:15. This presents yet another disputed issue of material fact for the jury, who could reasonably find on this record that Yacoub issued no warning.[46]

Koffinas testified that he did not have any opportunity to give warning before he fired his weapon. Doc. 106, FDLE E-Book, Int. w/ Sgt. Koffinas at 36:34-52. He explained that he did not do so because it was happening so fast, Olka's lights were on (at that point), he was wearing his vest, and he didn't believe any of the Plaintiffs would have heard him from behind (and outside of) the car. *Id.* In any event, Koffinas made no effort to activate his emergency lights prior to the Takedown.

Yacoub and Koffinas were in undercover vehicles wearing undercover clothing (albeit with tactical vests). *See, e.g., supra* sec. I.c. It was obviously feasible for them to give warning that they were law enforcement personnel before initiating

---

[45] Lindbery also commented on the noise of the cars crashing into one another and the Audi's acceleration, which may have muffled his and others' ability to hear any verbal warnings. *See* Doc. 106, FDLE E-Book, Int. w/James Lindbery at 8:40-:58.

[46] Plaintiffs testify that they heard nothing: no warnings, no shouts, no sirens, no lights. *See, e.g.,* Doc. 106, FDLE E-Book, Interview with Michael S. Gomez at 8:35-9:05. In any event, in light of the circumstances, it is doubtful that a voice warning could have been heard or processed by Baez.

the Takedown and any reasonable officer would have. *See Pipkin*, 134 F.4th at 1172-73. Their failure to give warning before initiating the Takedown and firing their weapons marks a departure from the conduct of a reasonable officer under these circumstances.

In its recent holding in *Barnes*, the Supreme Court expressly declined to answer "whether or how an officer's own 'creation of a dangerous situation' factors into the reasonableness analysis". 605 U.S. at 83. However, it did emphasize its holding that courts "must" consider "*any* relevant events coming before" the moment of the shooting—the logical extension of which implies that at least as to *whether* an officer's creation of a dangerous situation factors into the analysis, the answer is yes. *See id.* at 83-84.

The Takedown was not triggered by a need for instantaneous law enforcement reaction—this foundational fact distinguishes this case from most others.[47] *See* Doc. 106, FDLE E-Book, Radio Traffic Complete at 0:01-20:25. This was not like the majority of cases cited by the Deputies, where a run-of-the-mill roadside traffic stop was escalated after a suspect made the choice to flee from custody. Yacoub, Koffinas, and their fellow deputies were completely in control of the

---

[47] Gomez had even *uncovered* the license plate just before the Takedown, easily enabling the vehicle to be investigated if it somehow eluded the 28 OCSD personnel in the parking lot. *See, e.g.*, Doc. 78 at 14. Koffinas even testified to his own personal knowledge of this fact. Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 17:17-23.

situation, monitoring Plaintiffs in the store and in the parking lot under very little, if any, time pressure. *See supra* at sec. I.b. Moreover, they had a small army of 28 deputies (and a *helicopter*) covering all the exits and possible escape routes from the parking lot—Lt. Griffin himself was throwing down a spike-strip at the entrance to the parking lot when it occurred. *See supra.*

As the Supreme Court emphasized in *Barnes*, "when a driver abruptly pulls away during a traffic stop, an officer has no particularly good or safe options. None of the options available to the officer avoids danger to the community, and all of them require life-or-death decisions that must be made in a few seconds in highly stressful and unpredictable circumstances." 605 U.S. at 89. Thus, it follows that the reasonable officer would *avoid* making a traffic stop on a suspect vehicle that he knows may pose these risks when that reasonable officer has ample opportunity to detain the suspects before they re-enter the vehicle or surveil the vehicle until it is in a safer location to apprehend (ie. *not* in a busy Target parking lot).[48] *See id.*

And it is for precisely this reason that there can be no question that Yacoub, Koffinas, and their fellow deputies *directly* contributed to creating a dangerous

---

[48] Indeed, it is eminently practicable (and more efficient) to respond to petit crimes with proportional force. *See, e.g.*, Stephanie Moore, *78 arrests made during undercover operations at Target, Walmart stores in North Carolina*, WYFF NBC 4 (Jan. 1, 2026, 12:40 PM), https://www.wyff4.com/article/arrests-undercover-operations-target-walmart-stores/69887293 ("This coordinated approach allowed officers to identify theft in real time, target habitual offenders, and intervene before stolen merchandise left the store.").

situation where none was otherwise extant.[49] For all of these deputies' expressed concerns regarding window tint and a covered license plate, there was no indication that Plaintiffs posed any threat to officers or the public except that they were "set up to flee." *See* Doc. 78-1 at 11:19-22. And instead of focusing on safely conducting a stop, they opted for the one action that was almost guaranteed to sow chaos. The only discernable justification for the deputies' insistence on forcing the Takedown is that they were eager to practice their training; and that is not a lawful justification.

Defendants argue that the Eleventh Circuit has warned against this kind of "Monday-morning quarterbacking[,]" but that admonishment does not apply here. Doc. 157 at 8 (quoting *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003), *as amended* (Sept. 29, 2003)). In *Carr*, the Eleventh Circuit analyzed the response to a man who had drawn his gun, chambered a bullet, and was aiming towards an officer—not a vehicle that maxed out at 8 miles per hour trying to escape an undercover police block. 338 F.3d at 1269-70. If one of the Plaintiffs had emerged from the Audi and pointed a gun at an officer *Carr* might be analogous, but on the instant facts it simply is not.

---

[49] *Graham* counsels that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 196-97. Any split-second judgments Yacoub and Koffinas were "forced to make" here were of their own creation.

The Court is permitted—and required—to consider "whether the final [few] seconds of the encounter would look different if set within a longer timeframe"—it cannot "put on chronological blinders." *Barnes*, 605 U.S. at 82. Here, the longer timeframe reveals that the final seconds could have looked much different if Yacoub, Koffinas, and their fellow deputies had stuck to Griffin's reasonable suggestion to "do a safe block somewhere else." Doc. 78-1 at 14:12-13.

This factor is not dispositive on its own. As *Barnes* recognized, "historical facts" will often not matter as much to the reasonableness analysis in many cases. 605 U.S. at 82. Nevertheless, "no rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach we have prescribed." *Id.* Yacoub and Koffinas obviously contributed to the creation of the dangerous situation that unfolded in this case.

Finally, the Court considers the conduct of the suspects because it "indicates the nature and level of the threat [they] pose[d], either to the officer or to others." *Barnes*, 605 U.S. at 80. Plaintiffs here were suspiciously dressed in masks and hoods and covered their car license plate, but they displayed no threatening behavior.[50] *See generally* Doc. 78-1 at 9:25-10:8, 11:19-22. Plaintiffs do not dispute that they can be observed stealing merchandise in Target but there is no evidence that they

---

[50] According to Yacoub, however, he and his fellow deputies "perceive everybody as a threat." Doc. 93 at 16:16-20.

threatened any individuals in the store or that the Audi otherwise posed any danger to the public while it waited. *See id.*

When the Takedown began, however, Plaintiffs attempted to escape between the Sienna and the Ram. *See supra* I.d. In the absence of emergency lights, whether Baez "acted as any reasonable person in [this] position would have" is a question for the jury. *Watkins v. Davis*, 156 F.4th 1084, 1113 (11th Cir. 2025). There is no dispute that Baez initially accelerated the car straight out of the parking space in an attempt to evade these two vehicles, but everything beyond that point requires the resolution of disputed issues of fact: whether Baez knew they were being apprehended by law enforcement; whether the Audi turned towards the right or it was redirected that way because of the collision with the Sienna; when Yacoub's shots were fired; when Koffinas' shots were fired; and when Baez became incapacitated. *See supra*; Primary Video 0:08-:20. Construed in Plaintiffs' favor, those facts could support a conclusion that Baez "did not drive erratically but in a straight line out [his] only escape path."[51] *Watkins*, 156 F.4th at 1113.

Dr. Rundell opines that when the emergency lights came on in Dr. Olka's Toyota Sienna, they would have been in Baez's field of vision. *See* Doc. 100-1 at 29-32. But as Terpstra countered, the Audi had already started moving and only

---

[51] Beaz and the Audi in this case look nothing like the dangerous suspects in *Pipkins,* or in *Powell* where "an armed suspect…was raising his firearm in the officer's direction." 25 F.4th at 923.

impacted the Sienna 1.3 seconds after the lights came on. *See* Doc. 95-1 at 7-8. Moreover, even if Baez was looking at the Sienna when the lights came on, he was already driving and would take some amount of time to process what he was seeing and react.[52] *See* Doc. 95-1 at 8. In fact, it would not be unreasonable for a jury to conclude that, based on the Audi's Pre-Crash Data table, Baez hit the accelerator—then saw the lights and began to lift his foot before being shot and collapsing back onto the accelerator. *See supra* at 18.

Drawing all inferences in Plaintiffs' favor, the record shows that Plaintiffs did not make any threatening actions toward deputies apart from their attempt to escape from what they could reasonably have perceived was a multi-vehicular assault.[53] *See, e.g.*, Doc. 106, FDLE E-Book at 68; *Watkins*, 156 F.4th at 1112.

---

[52] Defendants point out that the Court must account for "the delay in response time for deputies as they react to the change in circumstances[;]" it must surely then also account for delays in response time for Baez, too. *See* Doc. 157 at 10. Baez had less time to react between the Ram's initial impact and the final collision with the Dodge Caravan than the reader will have to finish this sentence.

[53] Defendants rely heavily in their briefing upon cases like *Spencer*, *Tillis*, and *Pace* for their contention that the Audi's movement constituted aggravated assault. *See* Doc. 78 at 27-29. The present matter is obviously distinguishable; in those cases, the use of deadly force occurred after law enforcement attempted to stop the suspects with emergency lights activated but the suspects knowingly fled, leading law enforcement on prolonged, high-speed, dangerous chases. *See Spencer v. City of Orlando*, 725 Fed. Appx. 928, 930 (11th Cir. 2018) (unpublished); *Tillis v. Brown*, 12 F.4th 1291, 1295 (11th Cir. 2021); *Pace v. Cabobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002). Those cases look nothing like the instant matter.

Moreover, in Florida the crimes of fleeing or attempting to elude a law enforcement officer and aggravated fleeing or eluding—which are more applicable than aggravated assault—require that the operator of the vehicle "hav[e] knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer [and] willfully refuse or fail to stop the vehicle in compliance with such order." Fla. Stat. § 316.1935(1) (emphasis added). Indeed, Florida courts

*    *    *

Though some of the preceding actions were taken by individuals other than Yacoub and Koffinas, they provide important context for the Court's individual analysis of each's actions. *See Aquirre*, 158 F.4th at 1296. On this record, neither Yacoub nor Koffinas are entitled to qualified immunity.

### a) Yacoub

The Court has several concerns regarding the reasonableness of Yacoub's conduct, beginning with his initiation of the block in the first place. When FDLE investigators asked Yacoub how confirmation to do the block came about, Yacoub prevaricated, suggesting Griffin had confirmed it on the radio—but Griffin's final command unequivocally did not "confirm" that deputies should execute a block. Doc. 106, FDLE E-Book, Int. w/ Sgt. Ramy Yacoub at 20:55-21:15. Yacoub followed that demonstrably incorrect answer up by stating the following:

> I don't know how else to word it without sounding rude, but…anybody with a brain would know that if we tried to pull them over with a regular marked vehicle on a regular traffic stop on the road, they're not stopping, they're going to run, they blocked their tag for a reason.

---

have held that without evidence of a defendant's knowledge that he is fleeing from law enforcement, judgment of acquittal is proper. *See Creed v. State*, 886 So.2d 301, 302-303 (Fla. Dist. Ct. App. 2004). There is no such evidence here and, construing the facts in Plaintiffs' favor, no reasonable officer would have assumed there was under these circumstances.

Doc. 106, FDLE E-Book, Int. w/ Sgt. Yacoub at 21:30-48. Yacoub's response sounds more like an excuse for taking the actions he did than a satisfactory answer to the FDLE investigator's question.[54] Indeed, the record indicates that Yacoub and his fellow deputies took it upon themselves to initiate the block.

The Radio transcript lists the line as spoken by an "unidentified speaker" but it is clear to the Court that it was Yacoub who gave the final commands for Det. Olka to "take the driver's side," the only evidence in the record of the initiation of the block. *See supra* at note 42. Yacoub was leading vehicle takedown training that day and had clearly been the leader in planning the original block; a reasonable jury could easily determine that he led the deputies in the Takedown.[55] *See, e.g.*, Doc. 78-1 at 6-10; Doc. 106, FDLE E-Book, Int. w/Lt. Howard Griffin at 11:20-35.

Then, once the Takedown began, Yacoub chose to get out of the Ram despite seeing the Audi accelerating forward. It was Yacoub's testimony that he would not "just jump out—if the car [the Audi] was already moving I wouldn't get out of the car." Doc. 106, FDLE E-Book, Int. w/ Sgt. Ramy Yacoub at 25:30-25:45. Yet according to both parties' experts, he opened the door only 0.3 seconds before the

---

[54] Moreover, an equally plausible explanation for Plaintiffs' covering the Audi's license plate in the Target parking lot would be to avoid detection by Target's surveillance cameras. And Gomez's action to remove the paper covering before the Audi departed could plausibly have been taken to avoid suspicion from law enforcement once on the road.

[55] *See, e.g.*, Doc. 78-1 at 12:21-22 ("SGT. SCOTT KOFFINAS: Let me know when you want me to go, Ramy [Yacoub].").

Audi began to move forward—practically simultaneously—and decided to jump out into harm's way.[56] *See* Doc. 78 at 10; Doc. 95-1 at 9.

Moreover, in doing so, he essentially made the unilateral choice to use deadly force to stop the Audi—deadly force which was not necessary to prevent an escape from charges that did not warrant it. *See Garner*, 471 U.S. at 11-12; Doc. 82 at 14:2-12. Not only were there dozens of deputies securing the entrances and exits to the Target parking lot, but Det. Chris Koffinas was only *moments* away from plugging the glaring hole Yacoub left in the initial block which halted the Audi's attempted escape. *See supra* at I.d. No reasonable officer in Yacoub's shoes would have exited their door under these circumstances.

Notably, by the time he discharged his firearm he was *beside* the Audi, firing at the driver *through the passenger window*—the Audi's front end had already gone past him.[57] If it was escaping, as he testified, he was no longer in danger when he fired (as Plaintiffs' counsel recognized in deposition, "the car can't go sideways").[58]

---

[56] Yacoub's testimony that he wouldn't get out of his vehicle if the Audi was moving sounds more like someone recognizing that a reasonable officer in his shoes would not have taken the actions that he did. *See* Doc. 106, FDLE E-Book, Int. w/ Sgt. Ramy Yacoub at 25:30-25:45; *Watkins v. Davis*, 156 F.4th 1084, 1110 (11th Cir. 2025) ("[W]e think it common sense that an officer can't step in the middle of oncoming traffic, taking drivers unaware, and reasonably claim to be the victim of vehicular assault.").

[57] Indeed, Chris Koffinas testified that he heard shots *after* his car had blocked the Audi from further movement. Doc. 106, FDLE E-Book, Int. w/Chris Koffinas at 2:27-4:36.

[58] Yacoub testified that he fired to save his own life. Doc. 106, Int. w/ Sgt. Ramy Yacoub at 28:20-:35. However, he also testified that before firing he thought the Audi had already run-over and killed Olka. *See supra* at 16. The Court notes that this contention is simply not credible given

*See* Doc. 93 at 22:12. A reasonable deputy who was aware that he had initiated a sloppy block without any warning or notice that he was law enforcement would not have taken these actions to detain a few petit thieves—particularly where he also knew upwards of 20 other deputies and a helicopter were positioned to prevent Plaintiffs' escape.

Yacoub cites to cases like *Settle* and *Tillis*, which suggest that even if an officer was clearly out of harm's way when he fired qualified immunity could still apply in certain circumstances. *Settle v. Collier*, 160 F.4th 1282, 1289-91 (11th Cir. 2025); *Tillis v. Brown*, 12 F.4th 1291, 1295 (11th Cir. 2021). But those cases do not share the same context as this case—most fundamentally because the suspects in *Settle* and *Tillis* (and their brethren) were aware that law enforcement sought their custody.

This matter is further distinguished by the fact that Det. Chris Koffinas was only moments away from halting the Audi's escape—in fact, a jury could reasonably determine that he had already done so before Yacoub fired. A reasonable deputy in Yacoub's shoes would have taken account of the dozens of deputies locking down the parking lot and would know that Det. Chris Koffinas was going to come in behind the Ram to complete the block. That Yacoub (as a

---

his direct line-of-sight to Olka's door from the passenger side of the Dodge Ram. *See supra* at 12.

senior leader) was unaware of his presence is only further evidence of his own reckless creation of any danger he faced.

There are simply too many disputed factual issues regarding Yacoub's conduct to grant his Motion. Because many of these questions ultimately turn on weighing the credibility of witness testimony, only a jury can properly determine what Yacoub did and whether it constituted excessive force. *Aguirre*, 158 F.4th at 1300. Considering these facts in the light most favorable to Plaintiffs, qualified immunity is not appropriate because a reasonable jury could find that Yacoub's conduct amounts to the unconstitutional use of excessive force.

### b) Koffinas

The calculus is worse for Scott Koffinas. He pulled up to the scene as the Audi was already in motion and ran towards it—but he likely did not fire until the Audi had already come to a complete stop. *See supra* at sec. I.d.; sec. III.A.1.b.; Doc. 95-1 at 6 ("Based on JS Held's video analysis, Sergeant Koffinas did not have his weapon drawn and aimed until 1.7 seconds *after* the Dodge Caravan and the Audi collided."). The danger was moving away from him in this instance and he testified that his only reason for firing was to stop the Audi from escaping the block and endangering others (having thought that the Audi had already run over Yacoub). *See* Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 28:05-:58. But if the Audi was definitively stopped by the Dodge Caravan before he fired, this justification

rings hollow—it is indisputable that no reasonable officer would have used deadly
force to prevent the Audi's escape when the Dodge Caravan had already done so.

Another disputed factual issue centers on whether Yacoub—who testified to
never ducking down or crouching—would have been visible to Koffinas at the time
he fired. *See* Doc. 93 at 19:8-12. The parties' experts offer competing theories
regarding whether and when Yacoub would have been out of Koffinas' line of sight
so this question must also be weighed and resolved by a jury. *See* Doc. 95-1 at 9-10;
Doc. 100-1 at 24-26. If Yacoub was visible to Koffinas—who admits to seeing that
Yacoub had at least *some* cover—those grounds for using deadly force likewise ring
hollow.[59] *See* Doc. 106, FDLE E-Book, Int. w/ Sgt. Scott Koffinas at 26:20-46.

Koffinas admits that he did not even attempt to give a verbal warning before
firing 14 shots into a vehicle that he knew contained at least 3-4 occupants.[60] There
was no reason to fire upon the stopped Audi before—at minimum—seeking some
kind of compliance from its occupants that went unheeded. *See Watkins*, 156 F.4th
at 1112 (qualified immunity granted in cases where suspect used their vehicle as a

---

[59] Moreover, Fisher—who was in the cab of the Ram under considerably greater stress than
Koffinas—testified that he, too, was prepared to fire his weapon because he had lost sight of
Yacoub. Doc. 106, FDLE E-Book, Int. w/Det. Jordan Fisher at 5:12-43. But Fisher was capable of
analyzing the situation in front of him and exercising caution before deploying lethal force. *See id.*

[60] Efficacy and feasibility are two different concepts, and there is little to suggest any
reason why it was not *feasible* for Koffinas to give warning before employing deadly force—he
was not personally in any danger and, at best, the Audi was still in the process of being blocked
by *four* undercover vehicles (construed in Plaintiffs' favor, it was already so blocked).

weapon, but they "involved a suspect who apparently disobeyed orders from clearly identified officers"). Giving warning in this context also would have served an important purpose for the suddenly endangered public (and his fellow deputies) to take cover because law enforcement is on the scene. The 9-1-1 calls in this case show why this is so. *See, e.g.*, Doc. 106, FDLE E-Book at 7-9.

Consequently, whether Koffinas used excessive force likewise turns on disputed issues of fact which must be resolved by a jury. *Aguirre*, 158 F.4th at 1300. Like Yacoub, when viewed in the light most favorable to Plaintiffs, the evidence cannot support his motion for summary judgment on the excessive force claims or the application of qualified immunity.

## 2. Plaintiffs' Fourth Amendment Rights Were Clearly Established

Even if Yacoub and Koffinas violated Plaintiffs' Fourth Amendment rights, they are still entitled to qualified immunity unless Plaintiffs' can show that their rights were "clearly established" at the time of the Takedown. *See Watkins*, 156 F.4th at 1097. This can be shown by any of three ways:

> (1) identify a qualifying case with indistinguishable facts, (2) rely on a broad statement of principle within the Constitution, statute, or case law, or (3) show that the Officers' behavior was so egregious that it was obvious a constitutional right was clearly violated, even in the total absence of case law.

*Id.* at 1097-98 (internal quotations and citations omitted).

The most fundamental of Yacoub and Koffinas' shortcomings is that they failed to give any warning to Plaintiffs before initiating the Takedown and employing deadly force. At the very least, *Garner* established nearly four decades prior to this incident that warning, if feasible, must be given before using deadly force. 471 U.S. at 11-12. Moreover, as far back as 1963 the Supreme Court held that "when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight…must be regarded as ambiguous conduct."[61] *Id.* at 1109 (quoting *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)). On this record, a jury could conclude that "no reasonable officer could have believed that [Plaintiffs] w[ere] disobeying orders from clearly identified officers when [they] fled." *Watkins*, 156 F.4th at 1113.

And the Eleventh Circuit has "[c]onsistently…clearly established that officers cannot improperly provoke…a person into fleeing and use the flight to justify a stop." *Id.* at 1109. More concisely, since at least 2003 the Eleventh Circuit has made clear that "a police officer can use deadly force to prevent the escape of a fleeing non-violent **felony** suspect *only when the suspect poses an immediate threat of serious harm to police officers or others*." *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir.

---

[61] Indeed, almost every case cited by Yacoub and Koffinas involving chases and vehicles being used as weapons also clearly established that giving notice is a fundamental prerequisite to the use of force. *See supra* at note 53.

2013) (quoting *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003)) (emphasis added).

As the Court has recognized, the underlying crimes here were not even felonies. It is clear from the precedent of this Circuit that no reasonable officer would have interpreted the Audi and its occupants as posing an immediate threat of serious harm to anyone until Yacoub led a sloppy block—without warning—and decided to invite danger by exiting his vehicle. *See, e.g.*, *Watkins*, 156 F.4th at 1110. And any reasonable officer in Koffinas' shoes (wearing pain clothes) would not have fired 14 rounds into the back of an occupied vehicle that had no means of escape.

While Plaintiffs have established that their Fourth Amendment rights were well-established at the time of the Takedown, Yacoub and Koffinas' conduct also falls into the bucket that is "so egregious that it was obvious a constitutional right was clearly violated, even in the total absence of [identical] case law."[62] *Id.* at 1097-98 (internal quotations and citations omitted). Proportionality is an important consideration in the context of excessive force and any reasonable officer would have recognized that the force deployed by Yacoub and Koffinas "was drastically

---

[62] In particular, any reasonable officer on the scene would know that Koffinas' brash actions—firing blindly into the rear of a vehicle wanted for petit crimes that was likely already blocked and posing no further danger to the public—fall into this category.

in excess of what [Plaintiffs'] movements warranted." *Patel*, 959 F.3d at 1340; *see also*

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Our opinion in *Lanier* thus makes clear that

officials can still be on notice that their conduct violates established law even in

novel factual circumstances.").

Plaintiffs' Fourth Amendment right to protection from the kind of seizure

executed by Yacoub and Koffinas has unquestionably been clearly established in

this Circuit for decades.

### B. *Monell* Claim

The Supreme Court decided in *Monell v. New York City Dept. of Social*

*Services,* 436 U.S. 658 (1978), "that a municipality can be found liable under §

1983 only where the municipality *itself* causes the constitutional violation at issue."

*City of Canton v. Harris*, 489 U.S. 378, 386 (1989) (emphasis original) (citing *Monell*,

436 U.S. at 694-95). "As with supervisory liability, a municipality cannot be held

responsible for the actions of its employees based only on *respondeat superior*."

*Bridges v. Poe*, 155 F.4th 1302, 1318 (11th Cir. 2025). "Instead, the plaintiff must

demonstrate the municipality's policy or custom was the 'moving force' behind the

alleged constitutional violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333

(11th Cir. 2021).

To prevail on a *Monell* claim, "plaintiffs must show (1) that [their]

constitutional rights were violated; (2) that the municipality had a custom or policy

that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Id.* "A custom or policy must be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (quoting *Monell*, 436 U.S. at 691). Courts have further clarified that a "municipalit[y]…may be held liable for failure to train their employees." *Id.* However, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.

The Sheriff first argues that this claim fails because there was no underlying constitutional violation. Doc. 78 at 38. However, the Court has already found that a reasonable jury could find that Yacoub and Koffinas used excessive force in violation of Plaintiffs' Fourth Amendment rights so that argument has been foreclosed. *See supra.*

The Sheriff next argues that Plaintiffs' citations to "post-incident public statements by the Sheriff and the lack of disciplining of Yacoub and Koffinas or other deputies on scene" cannot have "caused" the violation of Plaintiffs' constitutional rights because they came after the event. Doc. 78 at 38; *see also Canton*, 489 U.S. at 385. Blackmon is correct that this post-incident ratification theory has been rejected by the Eleventh Circuit. "Only when the authorized policymakers approve a subordinate's decision and the basis for it have they ratified that decision." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015). And obviously the

Sheriff "did not review any part of [Yacoub, Koffinas, or the other deputies'] actions before they became final, much less approve the decision and the basis for it[.]" *Id.*

Plaintiffs counter that former Sheriff Lopez's *ex post facto* ratifications can "lend weight" to their (bald) allegation that "there is a widespread practice of unconstitutional behavior" at the OCSD. *See id.*; Doc. 157 at 23-24. But they offer no evidence to support that charge. Plaintiffs cannot rebut the fact that this was an isolated incident and therefore, "by definition, not a persistent failure." *Salvato*, 790 F.3d at 1297.

Finally, the Sheriff notes that Plaintiffs' expert does not dispute that the underlying OCSD policies that would be applicable to the underlying events in this case are consistent with the law and the Constitution. Doc. 78 at 38-39. Indeed, in their Response Plaintiffs only argue that "unwritten policy" can establish liability under *Monell*. Doc. 157 at 21. While this is true, Plaintiffs offer little to support their averment. They note that Lt. Griffin cut training short and testified that all deputies were certified in tactical parking training, but do not connect these facts to any argument.[63] *See id.* at 22.

Instead, Plaintiffs engage in a rambling discussion about the OCSD's Annual Use of Force Reports ("Reports"). *Id.* at 22-23. Plaintiffs' argument essentially

---

[63] The Court further notes that many of the officers participating—like Yacoub—had already completed the training and were actually instructing it. Doc. 93 at 6:10-7:1.

amounts to a claim that OCSD manipulates these Reports to minimize the reporting of use of force incidents and, as a consequence, did not react to a 42.28% increase in use of force incidents in 2021 (because the Report only stated there was a 4.46% increase). *Id.* If the Reports had been accurate, Plaintiffs contend, "this incident may have been avoidable." *Id.* at 23.

But there is no evidence to show that the Reports were not accurate. As Commander Jason Herman ("Herman") explained in his deposition, the purported mathematical discrepancies that Plaintiffs identified are actually just symptomatic of the program used to track these incidents. *See* Doc. 83 at 48-49. Indeed, "if two people use force on the same person…it gets counted as two separate incidents"—*ie.* even though Yacoub and Koffinas both discharged their firearms during the Takedown, it would be classified as one use of force incident. *Id.* at 48:14-20. Plaintiffs have not shown that OCSD's decision to track these use of force incidents as comprehensive units constitutes a custom which ignores Fourth Amendment rights—much less a direct causal link to Yacoub and Koffinas' use of force.[64] *See generally* Doc. 157 at 22-24; *Canton*, 489 U.S. at 385.

---

[64] Even if there were some discrepancy, the 2022 Report referenced by Plaintiffs shows that there were zero instances of firearm use of force incidents in both 2020 and 2021. *See* Doc. 83-2 at 10-11. Therefore, even if the Court were to credit Plaintiffs' convoluted assessment of these Reports, it is unlikely that any changes would have resulted to use of firearms policy, which is all that is relevant here.

Ultimately, Plaintiffs have presented no comparator incidents to establish any kind of persistent pattern of unconstitutional policies or customs and can point to no real evidence of any culpability on behalf of the OCSD for failure to train. *See generally* Doc. 157 at 21-24; *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference [a stringent standard of fault] to the rights of persons with whom the untrained employees come into contact."). In the absence of any competent evidence to the contrary, the record shows that the Sheriff is entitled to summary judgment on Plaintiffs' Count IX *Monell* claim.

## IV.   Conclusion

As this Court has stated previously:

> If a balancing test is to have any real meaning, a jury ought to be deciding whether the risk posed by the fleeing suspect is too minimal, or the suspected crime too minor, to make killing him a reasonable way to halt the chase. Nevertheless, based on my reading of *Harris*, that decision has been taken away from the jury where, as here, the fleeing suspect has endangered others.

*Beshers v. Harrison*, 495 F.3d 1260, 1272 (11th Cir. 2007) (Presnell, J., concurring).

While the long, hazardous chase in *Beshers* (and other similar cases) left no room for doubt, whether Baez and Plaintiffs here constitute "fleeing suspects" during their short-lived, 3.5 second, 8 mile-per-hour getaway is precisely the question that remains for the jury. The surveillance cameras here leave too many

disputed facts unresolved regarding where the Deputies were and what they did during the 5-10 seconds of chaos that unfolded in the Target parking lot that night.[65]

The Court has concluded that a reasonable jury could adopt Plaintiffs' version of these events. "Of course, a jury could instead credit some of the Officers' testimony and come to the [] conclusion…that the Officers' actions were reasonable. But these sorts of issues should not be decided at the summary judgment stage." *See Underwood v. City of Bessemer*, 11 F.4th 1317, 1331 (11th Cir. 2021) (citing *Vaughan*, 343 F.3d at 1331–32).

The line of cases cited by Defendants share a common theme: vehicles being driven dangerously to evade obvious law enforcement authority. And there is no question that Eleventh Circuit jurisprudence has, over the years, expanded the doctrine of qualified immunity to apply in most conceivable iterations on that basic factual premise—particularly where a law enforcement officer is standing *anywhere* in the vicinity of a suspect's vehicle. *See Settle*, 160 F.4th at 1289-91. But this case is not like those cases.

---

[65] Those disputed facts include: whether Target sought prosecution of Lowe and Gomez for theft; whether Yacoub and Koffinas had authorization to conduct the Takedown; whether the Ram impacted the Audi before the Audi moved forward out of the parking spot; whether Baez saw the emergency lights in the Toyota Sienna; whether the Audi was turned to the right by Baez or was "redirected" by the Toyota Sienna and the other OCSD vehicles; the whereabouts of Yacoub throughout the sequence, including where and when he fired (and whether he gave a verbal warning); who fired the first shot and when; and whether Yacoub and Koffinas fired before or after the Audi came to rest after crashing into the Dodge Caravan.

Here, it is entirely plausible that Baez and Plaintiffs had no idea that the Ram and Sienna were law enforcement vehicles and that they were being lawfully stopped; if the Court is to put itself in Baez's shoes that evening, it would be hard-pressed not to react in the same manner that he did.[66] *See, e.g.*, Doc. 88 at 110:5:-10; 116:23-117:14. A reasonable person would try to escape after being rammed by an unmarked truck and van—"[t]hat's not suspicious behavior; it's survival instincts. And a reasonable officer would realize that." *Watkins*, 156 F.4th at 1109. Yacoub and Koffinas' choice to inject deadly force into the completely avoidable chaos they created to stop a couple of petit thieves does not warrant the protection of qualified immunity.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part**:

1. Defendants' are entitled to summary judgment on Plaintiffs' Count IX *Monell* claim;

2. However, as to Counts I–VIII for violation of Plaintiffs' civil rights under the Fourth Amendment, Defendants' motion is hereby **DENIED**.

---

[66] This is particularly true given that Baez had himself been the victim of a robbery (in a downtown Orlando parking garage) only six months prior to these events which left him shot in the abdomen and using a colostomy bag. Doc. 88 at 69:16-71:1.

The Court will enter Judgment for Defendants on Count IX at the conclusion of the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 13, 2026.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party